IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CDS FAMILY TRUST, *et al*,     *

    Plaintiffs,     *

v.     *     Civil Case No. 1:15–cv–02584–JMC

ERNEST R. MARTIN, *et al*,     *

    Defendants.     *

\* * * * * * * * * * * * * * *

**MEMORANDUM OPINION ADDRESSING THE REMAINDER OF DEFENDANTS CORSA COAL CORP.'S AND WILSON CREEK ENERGY, LLC'S MOTION FOR SUMMARY JUDGMENT**

At its core, this case involves an allegation that Defendants wrongfully mined[1] coal from an area where they did not own the necessary mineral rights. The case is before me for all proceedings by the consent of the parties pursuant to 28 U.S.C. § 636(c). Since referral on December 28, 2018, the Court has addressed those issues it could without a hearing. Defendants' Corsa Coal Corp. ("Corsa Coal"), Wilson Creek Energy, LLC ("Wilson Creek"), and PBS Coals, Inc. ("PBSC") (collectively, the "Coal Defendants") Motions to Preclude Expert Testimony, (ECF Nos. 136 & 139), were denied without prejudice. Coal Defendants' Rule 72(a) Objection, (ECF No. 150), was granted in part, as to historical observations and calculation changes, and denied in part, as to the disputed area specifically. The Parties confirmed subject matter jurisdiction. (ECF Nos. 195 and 196). And Plaintiffs' Motions for Summary Judgment as to Counts 1, 2, 3, 4, and 6 against WPO, Inc, ("WPO") (ECF No. 129), and as to Count 7 against Jeffrey Rose, (ECF No. 126), were denied.

---

[1] Not all of the Defendants performed actual mining but were instead involved as lessors or purchasers in the "chain" of mining operations.

1

Coal Defendants' Motion for Summary Judgment, (ECF No. 130), was also granted in part as to Corsa Coal in total, and Wilson Creek as to counts based on successor-in-interest liability. In doing so, the Court reserved judgment on the remaining issues presented by the motion pending a formal hearing, most critically the issue of mineral rights ownership. The hearing was held on May 21, 2019.[2]

After careful consideration of the briefing and oral arguments, the motion is **GRANTED in part and DENIED in part.** It is denied as to arguments concerning release and the statute of limitations, but granted as to the ownership/lack of ownership of the mineral rights within the 29.7-acre parcel currently[3] at issue in the case.

## I. BACKGROUND

Over one hundred years of conveyances now culminate in this dispute to determine who ultimately owns the mineral rights to a disputed 29.7-acre parcel in Garrett County, Maryland. (*See* ECF No. 80). Plaintiffs allege that they own all mineral rights to the parcel for the coal at issue.[4] (*Id.* at ¶¶ 12-13). Defendants Ernest and Patricia Martin ("the Martins") assert that they own the rights, and legally leased those rights to Defendant WPO for extracting coal and other minerals. (*Id.* at ¶ 19). In January 2011, PBSC entered into an agreement to purchase WPO's rights under the lease. (*Id.* at ¶ 23). From 2011 to 2013, PBSC and WPO mined coal from the parcel. (*Id.* at ¶¶ 25-26). In 2013, PBSC assigned the lease rights back to WPO and placed an order to purchase approximately 30,000 tons of coal mined by WPO, some of which was then re-

---

[2] At the hearing, the Court also heard argument on two other motions for summary judgment (ECF Nos. 125 and 127), and also had some discussion with the parties on a more recently filed motion for sanctions (ECF No. 206). Those motions will be addressed in separate orders.

[3] Although not included in any of their three complaints filed in this matter, Plaintiffs' expert argues that some of the disputed mining took place beyond the 29.7-acre parcel. At the hearing, the Court granted Plaintiffs permission to file a motion to amend for the Court's consideration.

[4] The coal at issue comes from the so-called "Upper Freeport" seam or vein, over which Plaintiffs assert full ownership. Plaintiffs concede that the Martins own the mineral rights to at least most of (939/1365ths) a different seam called the "Kittanning" seam not at issue in this case within the 29.7 acres.

sold to Defendant Wilson Creek. (*Id.* at ¶ 28). In 2014, Corsa Coal purchased PBSC, which continues to exist as a wholly-owned subsidiary of Corsa Coal. (*Id.* at ¶ 29). Plaintiffs filed this instant suit seeking damages and other relief based on the coal mined from the disputed parcel during the relevant period.[5]

Plaintiffs' Second Amended Complaint includes counts for: (1) declaratory judgment as to ownership interests within the disputed parcel; (2) trespass against the Martins, WPO, Jeffrey Rose and Debbie Rose as operators and agents of WPO ("the Roses"), and PBSC for allegedly entering the Plaintiffs' property and wrongfully removing coal; (3) unjust enrichment against all Defendants for profits alleged to have resulted from the mining; (4) conversion against all Defendants for extracting coal that Plaintiffs' claim ownership over; (5) accounting of Defendants' expenses, costs, and profits from the alleged conduct; (6) aiding and abetting against the Coal Defendants' for assisting in WPO's alleged trespass, and against the Roses for filing mining permit applications for WPO and PBSC despite Plaintiffs' purported ownership; and (7) a claim for past due payments arising from a prior trespass by Mr. Rose. (*Id.*).

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can do so by demonstrating the absence of any genuine dispute of material fact or by showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the

---

[5] The relevant period is a bit of a moving target, but seems to coalesce around the time period of approximately early 2013 through 2015 (at the latest).

3

nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F.Supp.35 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (citations omitted). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F.Supp.2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).

### III.  DISCUSSION

In their pleadings and at oral argument, the parties[6] agree that ownership of the mineral interests should be ruled upon by the Court as a matter of law based on the language of the conveying instrument(s), without resorting to extrinsic evidence. (ECF No. 215 at 7:3-13). Additionally, the Coal Defendants assert other defenses to the Plaintiffs' claims based on a prior release in other litigation and based on the statute of limitations. As fully discussed below, this Court does not agree that Plaintiffs' claims are barred by the prior release or by the statute of limitations. However, the Court does hold that Plaintiffs were not the owners of any of the mineral

---

[6] The Martins are currently *pro se*, did not attend the oral argument and have not filed a pleading since the filing of the Second Amended Complaint other than their consent to my jurisdiction.

rights within the 29.7-acre parcel at issue and therefore cannot maintain any of their claims relating to that parcel.

### A. The Pittsburgh Action Release

The Coal Defendants argue that all of Plaintiffs' claims are barred by the doctrine of release, based on a settlement agreement between some of the parties that occurred in earlier litigation in the Western District of Pennsylvania (the "Pittsburgh Action").[7] Plaintiffs counter that the earlier litigation concerned issues unrelated to the present case. At oral argument, Coal Defendant PBSC confirmed that the Pittsburgh Action concerned *different* parcels than those involved in the current dispute,[8] for mining activities that took place at an *earlier* time than those involved in the current dispute. Though the Coal Defendants acknowledge this, they nonetheless contend that the Pittsburgh Action was settled prior to robust discovery, and that Plaintiffs had taken some initial steps that, but for the settlement, may have further expanded the scope of that case had it not resolved when it did. Further, the Coal Defendants argue that because some of the alleged tortious activity in the present case would have already been underway at the time of the settlement of the Pittsburgh Action, the release executed to resolve the Pittsburgh Action should bar this case as well.

A settlement agreement is a contract and should be construed as such based on its language. *See Mazella v. Koken*, 559 Pa. 216, 739 A.2d 531, 536 (1999); *Taylor v. Solberg*, 566 Pa. 150, 778 A.3d 664, 667 (2001). In the recitals to the Settlement Agreement in the Pittsburgh Action, the parties defined "the property" at issue to be "approximately 20 acres in Garrett County, Maryland

---

[7] *PBS Coals, Inc. v. CDS Family Trust, L.L.C, et al.,* W.D. Pa. 3:13-cv-240-KRG (2013).
[8] Specifically, Coal Defendant PBSC confirmed that by its own calculations, the parcels involved in the two lawsuits were different, but pointed out that according to Plaintiffs' calculations, there was some overlap as to some of the parcels. If the Coal Defendants' calculations are accepted as true, this is enough to defeat their argument that the earlier release applies to the present case. At the very least, the dueling calculations raise a fact issue sufficient to defeat summary judgment.

as more particularly described in the complaint filed in the [Pittsburgh] Action." (ECF No. 130-9). The Settlement Agreement's mutual release language, though broad in many respects, was limited to matters "arising from the [Pittsburgh] Action." Certainly, the parties could have drafted a settlement agreement broad enough to incorporate not only those parcels and activities involved in — *i.e.*, "arising from" — the Pittsburgh Action, but other disputes brewing in other areas. Such language, however, is lacking. Similarly, it may well be that, but for the settlement, the earlier lawsuit would have grown to include the parcels and activities at issue in the instant case. However, there was a settlement that took place at a specific moment of time, and undergoing such speculation is not only unjustified, but contradicts the Court's duty to limit itself to the factual record before it and to construe that record in the light most favorable to the nonmoving party. Accordingly, the Court will deny summary judgment on the theory of release.

**B. Statute of Limitations**

The Coal Defendants also move for summary judgment based on a running of the statute of limitations. Specifically, the statute of limitations for each of Plaintiffs' causes of action against PBSC, (*i.e.,* trespass, unjust enrichment, conversion, and aiding and abetting trespass) is three years. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Although somewhat of a moving target, the Court's interpretation of the various pleadings before it is that the allegedly tortious activity took place beginning March 26, 2013 and continued through some point in 2015. The original Complaint was filed on September 1, 2015, (ECF No. 1), and PBSC was not added as a Defendant until the Second Amended Complaint, filed May 16, 2017. (ECF No. 80). Thus, based on the original Complaint, the earliest tortious activity not potentially barred by limitations would be September 1, 2012. While the latest, based on the Second Amended Complaint, would be no earlier than May 16, 2014.

Under either interpretation, some tortious activity survives PBSC's statute of limitations argument, precluding summary judgment in full. Which theories survive and for what period of time, however, depend on whether the Second Amended Complaint "relates back" to the original Complaint's filing date for statute of limitations purposes. The Court finds that it does for the reasons discussed below.

The filing of the Second Amended Complaint was not without controversy. Defendant PBSC challenged it arguing that Plaintiffs did not meet the requirements of Federal Rule of Civil Procedure 16(b)(4) dealing with modification of a scheduling order due to lack of good cause and diligence, and Rule 15(a)(2) dealing with amendments to pleadings due to futility based on these same statute of limitations arguments. (ECF No. 65). In rejecting these arguments, Judge Bennett of this Court found that the two rules were satisfied in that there was good cause to justify the amendment, there was no lack of diligence on Plaintiffs' part, and there was no prejudice to Defendant PBSC, especially given the inclusion of its corporate siblings in the original Complaint. (ECF No. 78). Further, Judge Bennett found that at the very least, some of the claims would survive a limitations challenge, stating, "[w]hile it remains to be seen whether certain claims against PBSC may be barred by the relevant statute of limitations, this Court cannot at this point conclude that all of plaintiffs' claims against PBSC are time-barred so as to render amendment futile." (ECF No. 78 at 7-8).

Admittedly, Judge Bennett did not directly deal with the issue of relation back. However, his finding that Rule 16(b)(4)'s "good cause" requirement was satisfied necessarily involved consideration of "danger of prejudice to the non-moving party, the length of delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith." *Tawwaab v. Virginia Linen Service, Inc.*, 729 F. Supp. 2d 757, 768-69 (D. Md. 2010).

7

For its part, Rule 15(c)(1)(C) allows relation back to the original date of filing when a new party is added when, *inter alia*, the allegations against the new party "arose out of the same transaction, conduct or occurrence set out in the original pleading," and would not prejudice the newly-added party due to a lack of notice. *Id.* Construing the facts most favorably to Plaintiffs, the conduct alleged against Defendant PBSC arises out of the same circumstances alleged in the Complaint against its corporate affiliates. This, combined with Judge Bennett's previous findings on lack of prejudice, satisfies Rule 15(c)(4)'s relation back standard.

### C. Ownership of Mineral Rights

#### 1. The 939/1365ths Interest in the Mineral Rights for the 29.7-Acre Parcel

The coal in question came from a 29.7-acre parcel within a larger 907.1-acre area known as "Mt. Cynthia" or "Table Rock."[9] To complicate matters, the ownership interest of the entire 907.1-acre area of Mt. Cynthia is itself divided into 1365 shares. At the time of the mining at issue, Plaintiffs admit that the Martins owned the *surface* rights to that 29.7-acre parcel, but assert that by virtue of several prior deeds (as to 939/1365ths of the rights) and by inheritance (as to the remaining 426/1365ths), Plaintiffs hold ownership over all 1365 shares of the *mineral* rights for the coal at issue[10] within that 29.7-acre parcel. Defendants counter that, in addition to all of the surface rights, the Martins owned 939/1365ths of the *mineral* rights to that parcel, and a third party owned the remaining 426/1365ths of the mineral rights. Thus, Defendants contend that the Plaintiffs owned none of the mineral rights for the coal at issue during the time of the allegedly wrongful mining and cannot sustain any of their causes of action regarding that parcel.

---

[9] Though all of their complaints limit the area of wrongful mining to the 29.7 acres, Plaintiffs' expert alleges in his supplemental report that only some of the mining (1.1 acres) came from that parcel while the remainder (2.25 acres) occurred beyond that parcel. This theory is presently not a part of the formal pleadings in the case, although the Court has granted Plaintiffs permission to file a Motion to Amend so that the Court may consider whether to allow expansion of the suit to include these additional areas.

[10] As mentioned, Plaintiffs concede that the Martins owned 939/1365ths of the mineral rights to a separate and unrelated seam of coal not at issue in this case within the 29.7-acre parcel.

The parties in their respective memoranda trace the full history of deed transfers culminating in Plaintiffs' and the Martins' respective interests, which need not be reiterated here. Suffice it to say that the key to determining who owned the mineral rights to the Upper Freeport seam underlying the 29.7-acre parcel is the November 9, 1950 deed from one of Plaintiffs' predecessors, the Andersons, to one of the Martins' predecessor, the Morelands (the "Moreland Deed").[11] (ECF No. 130-23).

In the Moreland Deed, the Andersons **"grant, bargain, sell and convey"** two separate tracts to the Morelands. In the first grant (unrelated to the current dispute), the Andersons conveyed:

> *All of the surface* of that lot, place or parcel of land situated, lying and being in Garrett County, Maryland and being a part of the larger tract of land known as 'Mt. Cynthia' . . . containing 240.06 acres, more or less.

*Id*. at 2-3 (emphasis added) (legal description omitted). In the second grant (key to the current dispute), the Andersons conveyed:

> *All that tract of land* the same being a portion of a larger tract of land known as 'Mt. Cynthia'. . . containing 29.7 acres, more or less.

*Id*. at 3 (emphasis added) (legal description omitted). After the two grants, the Andersons clarify that they "*also* grant and convey . . . all of their right, title and interest, in and to the Kittanning seam or vein of coal underlying the above second mentioned parcel [i.e., the 29.7 acres ultimately acquired by the Martins]." *Id*. (emphasis added).

Ordinarily, the construction of a deed is a question of law for the court and is subject to *de novo* review. *Calvert Joint Venture # 140 v. Snider,* 373 Md. 18, 38 (2003). In construing the language of a deed, the basic principles of contract interpretation apply. *Gunby v. Olde Severna*

---

[11] To be sure, there were subsequent predecessors in interest to Plaintiffs and the Martins, but those conveyances are not in dispute beyond the effect that the Moreland Deed had on them.

*Park Improvement Ass'n, Inc.*, 174 Md. App. 189, 242 (2007) (citations omitted). "These principles require consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Id*. (quoting *Chevy Chase Land Co. v. U.S.,* 355 Md. 110, 123 (1999)). Under the principles of contract interpretation, the court gives effect to the intention of the parties, gleaned from the text of the entire instrument, unless that would violate a principle of law. *Id*. "The 'true test' of what was meant by the language of the deed is 'what a reasonable person in the position of the parties would have thought it meant.'" *Id.* at 242-43 (quoting *Chesapeake Isle, Inc. v. Rolling Hills Dev. Co.,* 248 Md. 449, 453 (1968)).

In "interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern, without the assistance of extrinsic evidence." *Drolsum v. Horne,* 114 Md. App. 704, 709, *cert. denied,* 346 Md. 239 (1997). The "intention of a grantor is to be determined from the four corners of his deed, if possible, and if from an attempt to make such determination an irreconcilable conflict arises because of contradictions within the deed other means must be employed to ascertain the correct interpretation to be placed upon it." *Gunby*, 174 at 243 (quoting 4 Herbert T. Tiffany, The Law of Real Property § 981 at 112 (3d ed. 1975, 2007 Cum.Supp.)). However, in such circumstances, "the deed is construed against the grantor and in favor of the grantee." *Id*. (quoting *Morrison v. Brashear,* 38 Md. App. 693, 698 (1978)).

Section 2–101 of Maryland's Real Property Article is also relevant. Section 2-101 makes clear that a deed's use of the word "grant" or "bargain and sell" should be construed to pass the grantor's whole interest to the property to the grantee "unless a limitation or reservation shows, by implication or otherwise, a different intent." *Id*. In keeping with Section 2-101's guidance that the transfer of land is generally presumed to transfer the whole estate, this would include ownership of the minerals under the surface. Maryland law (like that of many states), however, authorizes

the severance of mineral rights from a land transfer by reservation or exception, thereby creating two separate estates. For example, in *Calvert Joint Venture #140*, *supra*, the Maryland Court of Appeals recognized that the following language effected such a severance:

> SUBJECT TO Grantor's reservation of all oil, gas or other mineral rights in and to the aforesaid property; Grantor also reserves in connection with the oil, gas or other mineral reservations, the right to execute leases or other documents relating to the production of oil, gas and other minerals upon such terms and conditions as are acceptable to Grantor.

*Id.* at 39, 47-51.

For language within a deed to create an effective severance or reservation it must be express, definite, clear, and will, moreover, be narrowly construed against the grantor. *Conrad/Dommel LLC v. West Development Co.,* 149 Md. App. 239 at 276–77 (2003) (citing 9 Thompson on Real Property, Second Thomas Edition, at § 89.09(c)(2), at 597–98 (1999)). Reservations and exceptions generally will not be implied. *Id.* (declining to find implied reservation of riparian rights). As the Maryland Court of Appeals observed, "[i]f a grantor intends to reserve any rights or uses in or over the tenement granted, he must reserve them expressly [excepting easements implied by necessity under certain circumstances]." *Dalton v. Real Estate Improvement Co.*, 201 Md. 34, 47 (1952). Thus, for example, the Court in *Calvert Joint Venture #140*, while recognizing that mineral rights can be and were expressly reserved, concluded that such rights did not, without more, create an implied easement onto grantee's property to allow grantor to extract from said mineral rights. *Id.* at 60-61.

In the instant case, Plaintiffs argue that in the Moreland Deed, the Andersons effectively reserved all but a portion (*i.e.*, the Kittanning coal seam) of the mineral rights in granting the 29.7-acre parcel at issue. This Court disagrees for several reasons.

11

First, as of the time of Moreland Deed, the mineral rights had never been severed from 939/1365ths of the estate being conveyed in any of the predecessor deeds.[12] A 1903 deed conveying the larger tract of 907.1 acres, of which the 29.7 were a part, granted "all that piece or parcel of land . . . *save and except*" the timber growing upon and fire clay underlying the same. (ECF 130-17 at 2 (emphasis added)). The 1942 deed by which the Andersons acquired what would become their total 939/1365ths interest in the minerals underlying the 29.7-acre parcel conveyed "all that part of a tract of land . . . *saving and excepting* all of the fire clay under said land." (ECF No. 130-22 at 3 (emphasis added)). By contrast, a 1940 deed granted to the Andersons only "the surface" of a 426/1365ths interest, but expressly stated that the grantors "reserve not only their right, title and interest in and to the minerals . . . but also the right of ingress, egress and regress over said property for the purposes of mining, drilling and removing [minerals]." (ECF No. 130-18 at 3). Thus, at the time of the 1950 Moreland Deed conveying the 29.7 acres, the 939/1365ths interest to the mineral rights that would ultimately become the Martins was intact.

Second, even comparing the Moreland Deed's language for the 29.7-acre parcel to the language used in granting the other parcel *within that same deed*, it is clear that the parties recognized how to reserve mineral rights when intended. For example, the Moreland Deed also granted "all of the *surface* of that lot, piece or parcel" (i.e., surface rights only) as to one 240-acre parcel carved from the larger 907.1-acre area. (ECF No. 130-23 at 2-3 (emphasis added)). By contrast, just one paragraph later, the Moreland Deed uses the broader language of "all that tract of land" in granting the Morelands the 29.7-acre parcel at issue. (*Id*. at 3). As noted, Maryland law presumes that such broad grants convey all right, title, and interest in the parcel including

---

[12] A 1940 deed to the Andersons had granted 426/1365ths of the remaining surface rights, but made clear that the grantors "reserve not only their right, title and interest in and to the minerals . . . but also the right of ingress, egress and regress over said property for the purpose of mining, drilling and removing said products." (ECF No. 130-18 at 3).

mineral rights. More importantly, the grant is completely devoid of any express reservation of mineral rights or any limitation on the estate conveyed. This stands in stark contrast to the language used for the 240-acre parcel or in any of the predecessor deeds (*i.e.* the 1903 deed as to timber and fire clay, the 1940 deed as to the minerals underlying 426/1365ths interest, and the 1942 deed as to fire clay).

Plaintiffs are then left to argue for an implied reservation which, as noted above, is only recognized under limited circumstances which are not found here. Plaintiffs' only support for such an argument comes from additional language in the Moreland Deed stating that, in addition to granting "all that tract of land" as to the 29.7-acre parcel, the Andersons "*also grant* . . . all of their right, title and interest in and to the Kittanning seam or vein of coal underlying [the 29.7 acres]." (ECF No. 130-23 at 3 (emphasis added)). Plaintiffs argue that such an additional grant referencing the Kittanning seam of coal implicitly reserved all rights to all other seams of coal (or other minerals) such that the Andersons could later grant those rights separately to Plaintiffs' immediate predecessors. But this position finds no support under Maryland law, which presumes all such rights are conveyed absent an express reservation, such as found in every other predecessor deed and in the Moreland Deed itself regarding the other parcel. There is simply no construction where words that "also grant" right, title, and interest to a specific seam of coal can be fairly read to except or reserve all rights to all other unnamed seams of coal underlying the property, including the Upper Freeport coal seam at issue here.

The Court finds (and the parties agreed at argument) that the Moreland Deed is unambiguous, such that this Court need not resort to extrinsic evidence. By granting "all that tract of land," it was the intent of the parties as expressed in the deed to convey both surface and mineral rights to the 29.7-acre parcel. The "also grant" language regarding the Kittanning seam in no way

contradicts the earlier, broader "all that tract of land" grant, and does not introduce any ambiguity (which, in any event, would be construed against the grantor). When the Andersons intended to reserve the mineral rights when granting the 240-acre parcel in the Moreland Deed they inserted the "only the surface" language.[13] Absent such an express reservation or exception with regard to the grant of the 29.7-acre parcel, neither the deed language nor Maryland law supports Plaintiffs' position, and the Court holds that the Martins own a 939/1365ths interest in all the mineral rights underlying the 29.7 parcel conveyed by the Moreland Deed, including the coal at issue.[14]

This does leave open the question as to why the additional language regarding the Kittanning seam was added to the already broad grant language. Perhaps it was to make clear mineral rights were indeed included, and the Kittanning seam was the only identified seam underlying the parcel or was the only one being actively mined at the time of the grant.[15] Perhaps the Andersons had some other claim over Kittanning coal in the area such as a royalty agreement with a mining company to whom they had granted a license or lease. This might be surmised from the fact that there was a mine—the Kelly and Moreland mine—that is included in the property description of the 29.7 acres. (ECF No. 130-23 at 3). Perhaps, as urged by PBSC in other pleadings in this case, the Upper Freeport seam had been historically misidentified as the Kittanning seam in this general

---

[13] Plaintiffs also attempt to support their implied reservation theory by reference to the Andersons' subsequent 1958 deed purporting to convey 939/1365ths the mineral rights to the entire 907.1-acre parcel to Plaintiffs' immediate successor, Buffalo Coal Company, excepting out the Moreland Deed and describing it as conveying "the surface and 939/1365ths interest in and to the Kittanning seam of coal." (ECF No. 130-19 at 8). Because the Court finds that the Moreland Deed is unambiguous, it need not resort to this extrinsic evidence as urged by Plaintiffs. Given the Court's conclusion that the Moreland Deed contains no language that could reasonably be construed as a reservation of mineral rights as to the 29.7 acres, the language of a subsequent deed to a different grantee (with, perhaps, its own motivations for wanting to claim ownership to additional seams of coal within that parcel) does not sway the Court.

[14] As noted, the remaining 426/1365ths interest in the mineral rights under the 29.7 acres was not conveyed to the Morelands by the Moreland Deed. Thus, Defendant Martins' interest in the mineral rights to the 29.7 acres is limited to the 939/1365ths interest conveyed by the 1950 deed. The ownership of the remaining 426/1365ths interest in the mineral rights underlying the Martins' 29.7 acres is discussed *infra*.

[15] For example, Del Signore Coal Company was mining the Kittanning and Lower Kittanning seams in the general area (Table Rock) at the time of the Moreland Deed in 1950. *See 28th Annual Report of the Maryland Bureau of Mines of the State of Maryland, Calendar Year 1950*.

area. (*See, e.g.*, ECF No. 50, Ex. B at 19-20 & 25-17 (relying on the *West Virginia Geological Survey*)). This is not, however, a question that the Court needs to answer with precision in reaching its decision today given its finding that the "also grant" language does not contradict or narrow the broader "all that tract of land" language or render it ambiguous. Additionally, even where an allegedly narrowing grant immediately follows a broad grant within a deed, the broader language prevails. *See Pritchett v. Jackson*, 103 Md. 696 (1906). In short, the reasons for including this non-conflicting grant are not germane to the Court's conclusion regarding ownership of 939/1365ths of the mineral rights at issue.

### 2. The Remaining 426/1365ths Interest in the Mineral Rights of the 29.7-Acre Parcel

This leaves the question of who owns the remaining 426/1365ths of the mineral rights underlying the Martins' 29.7-acre parcel. To be sure, no party contends that it is the Martins, WPO, or PBSC. The parties agree that as of 1979, Carl Del Signore (not a Plaintiff in this matter) owned the remaining 426/1365ths interest. Indeed, but for two small parcels not directly relevant here (the so-called "Fling" and "Blackburn" parcels, respectively), Carl Del Signore owned a 426/1365th interest in all the mineral rights to the entire 907.1-acre Mt. Cynthia tract.[16] (ECF No. 131-1 at 12). Carl Del Signore died in 1985 and, through his Last Will and Testament (the "Will"), bequeathed his real and other property to Plaintiff Carl Del Signore Family Trust.[17] (ECF No. 156-29 at 10).

It is Plaintiffs' contention that Carl Del Signore's 426/1365th interest "passed automatically upon Carl Del Signore's death in 1985 by way of his Last Will and Testament." (ECF No. 156 at

---

[16] Recalling that the Plaintiffs contend that 2.26 acres of the disputed area lies outside of the 29.7 acres, the parties dispute whether that additional area is part of the 907.1 acres of Mt. Cynthia so as to establish at least partial ownership of the mining rights from that additional area.
[17] Certain other personal property not relevant to this dispute was bequeathed to other individuals. (ECF 156-29 at 10).

11). It is the Coal Defendants' contention that the Will, without more, was insufficient to pass that interest, and it was not acquired by Plaintiffs until October 21, 2016—well after the disputed mining—by virtue of a deed from Carl Del Signore's personal representative conveying same. (ECF No. 130-24). Absent such legal title during the relevant time period, the Coal Defendants contend that Plaintiffs cannot maintain their causes of action against them for alleged violation of those rights. This Court agrees.

Prior to 1970, Maryland law provided that a will, without more, was sufficient to pass legal title to property under then-existing statutory law. *See Heill v. Staniewski*, 265 Md. 722 (1972). As of 1970 however, the statute was modified as follows:

> All property of a decedent shall be subject to the estates of decedents law, and upon the person's death shall pass directly to the personal representative, who shall hold the legal title for administration and distribution, without any distinction, preference or priority as between real and personal property.

Md. Code Ann., Estates and Trusts §1-301(a). As explained by the Maryland Court of Special Appeals in *Solis v. Schueneman*, 112 Md. App. 572, 585 (1996):

> [R]eal property does not pass directly to the heirs or devisees but forms part of the probate estate and passes to the personal representative. The personal representative holds legal title to the property, though only in his limited capacity as personal representative and only for the purpose of administration and distribution. If the property is to be distributed in kind, the distribution is effected by a deed from the personal representative and is it is only upon delivery of that deed that the person or persons ultimately entitled to the property acquire title to it.

(Internal citations omitted).

It is undisputed that no deed was delivered to any of the Plaintiffs until well after the allegedly wrongful mining took place. (ECF Nos. 209-1 and 209-4). Specifically, on October 21, 2016, the personal representatives did execute a deed transferring Carl Del Signore's entire

426/1365ths mineral interest in Mt. Cynthia (including the 29.7 acres) to Plaintiff CDS Family Trust, LLC. (*Id.*; ECF No. 130-24). While Plaintiffs argue that this was "mere estate housekeeping," (ECF No. 209 at 7), they have pointed to no other conveyance, assignment, or transfer that would otherwise grant them the requisite 426/1365ths interest in the mineral rights to recover for allegedly wrongful mining at the relevant time other than the Will itself. Additionally, even assuming *arguendo* that Plaintiffs had some claim to equitable title by virtue of the Will (which has not been argued or otherwise demonstrated), it is also long-established in Maryland that mere equitable title to property is insufficient to prosecute torts of the type alleged here. *See, e.g.*, *West v. Pusey*, 113 Md. 569, 77 A. 973, 974 (1915) (disallowing a claim for trespass based on equitable title in the absence of legal title).

Having already construed the 1950 Moreland Deed as granting 939/1365ths interest in the mineral rights for the 29.7 acres in favor of the Coal Defendants, the Court's conclusions above as to Plaintiffs' lack of ownership in the remaining 426/1365ths mineral interest defeat all claims by Plaintiffs against all Defendants stemming from allegedly wrongful mining from that 29.7-acre parcel.

The sole remaining substantive issue for the Coal Defendants relates to Plaintiffs' expert's contention that some of the allegedly wrongful mining took place beyond the 29.7-acre parcel discussed above.[18] To reiterate, Plaintiffs' expert contends by way of supplemental report that only 1.1 acres of the disputed area fall within the 29.7 acres, with the remaining occurring on immediately adjacent parcel(s). The Coal Defendants disagree, and further contend that none of the three complaints filed in the action refer to anything beyond the 29.7 acres. As such,

---

[18] There is still the matter of Plaintiffs' claims against Jeffrey Rose and WPO for unrelating mining and the Counterclaim against Plaintiffs brought by those Defendants Rose and WPO based on breach of an oral agreement concerning mining on an unrelated parcel. There is also the matter of the Coal Defendants' Motion for Sanctions which only recently became ripe.

notwithstanding Plaintiffs' expert opinion (which they argue is deficient under Federal Rule of Evidence 702), the Coal Defendants urge that any area beyond the 29.7 acres is not properly at issue in the case.

The Court agrees that the three complaints are insufficient to place any area beyond the 29.7 acres at issue in this case at this time. That said, at oral argument, the Court granted Plaintiffs' request to file a Motion to Amend their action to include such a claim, which was filed on June 11, 2019. (ECF No. 216). The Court anticipates Defendants will oppose that motion, and the Court will rule in due course. As part of that process, the Court asks the parties to address any record evidence establishing ownership of the mineral rights for that additional acreage. Further, given the Plaintiffs' representation at oral argument that they have no present evidence of allocation of coal as between the two areas, the Court asks the parties to address why, even if valid ownership of the mineral rights of the extra acreage is established, Plaintiffs' claims would or would not become unsustainable if unable to allocate the mining among the parcels. That is, if Plaintiffs cannot establish how much, if any, of the disputed coal came from the 29.7 acres (as to which the Court has ruled they have no valid ownership interest) versus the additional 2.2 acres (as to which they might have such an ownership interest), the Court at present is unable to see a clear path forward for Plaintiffs, subject, of course, to further input from the parties.

## IV. CONCLUSION

For the foregoing reasons, Coal Defendants' Motion for Summary Judgment, (ECF No. 130), is **GRANTED in part** and **DENIED in part**. It is **DENIED** as to arguments concerning release and the statute of limitations and **GRANTED** as to the ownership interests within the 29.7-acre parcel. A separate order follows.

18

Dated:  June 12, 2019                                                              /s/                          

                                                            J. Mark Coulson
                                                            United States Magistrate Judge